# In the United States Court of Federal Claims

No. 14-1231 C

Filed: April 6, 2015[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| **ANTHEM BUILDERS, INC.,** | Administrative Procedure Act ("APA"), 5 U.S.C. § 706 (Scope of review); Bid Protest; Competition in Contracting Act of 1984 ("CICA"), 31 U.S.C. § 3551 (Definitions); Federal Acquisition Regulations ("FAR"), 48 C.F.R. § 2.101 (Definitions), 48 C.F.R. § 9.105-1 (Obtaining information), 48 C.F.R. § 9.105-2 (Determinations and documentation), 48 C.F.R. § 28.203 (Acceptability of individual sureties), 48 C.F.R. § 28.203-1 (Security interests by an individual surety), 48 C.F.R. § 28.203-2 (Acceptability of assets), 48 C.F.R. § 28.204-3 (Irrevocable letter of credit), 48 C.F.R. § 52.228-11 (Pledges of assets), 48 C.F.R. § 52.228-15 (Performance and payment of bonds); Rule of the United States Court of Federal Claims ("RCFC") 52.1 (Administrative Record); Tucker Act, 28 U.S.C. § 1491(b); Uniform Commercial Code ("U.C.C."), U.C.C. § 5-102 (Definitions), U.C.C. § 5-104 (Formal requirements), U.C.C. § 5-108 (Insurer's rights and obligations). |
| Plaintiff, | |
| v. | |
| **THE UNITED STATES,** | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

---

[*] On March 12, 2015, the court forwarded a sealed copy of this Memorandum Opinion And Final Order to the parties to delete from the public version any confidential and/or privileged information, and note any citation or editorial errors requiring correction. Neither party requested any redactions or edits.

**James Hatcher Graham**, J. Hatcher Graham, P.C., Warner, Georgia, Counsel for the Plaintiff.

**Erin Kathleen Murdock-Park**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

<b>MEMORANDUM OPINION AND FINAL ORDER</b>

BRADEN, *Judge*.

## I.    RELEVANT FACTUAL BACKGROUND.[1]

On August 11, 2014, the United States Department of Veterans Affairs, National Cemetery Administration ("DVA") issued a Notice of Pre-Solicitation and Solicitation and a Request For Proposals ("RFP") for Solicitation No. VA786A-14-R-0047 ("Solicitation").  AR 46–105.  The Solicitation requested bids for a firm-fixed price contract to construct operations at the Golden Gate National Cemetery in San Francisco, California.  AR 46.  These operations included the "demolition and removal of existing pavement and rostrum stage" and the "construction of new rostrum stage, fencing guardrails, plaza paving, walks, and pavement replacement."  AR 51.  Offerors were to submit proposals to the Contracting Officer ("CO") by September 11, 2014.  AR 46.

---

[1] The facts discussed herein were derived from the January 16, 2015 Administrative Record ("AR 1–273") and the February 13, 2015 Supplement To The Administrative Record ("AR 274–76").  Anthem Builders, Inc. ("Anthem") does not contest the factual narrative in the Government's February 13, 2015 Motion For Judgment On The Administrative Record.  Pl. Resp. at 2–3 ("The facts have been fairly stated in . . . the [Government]'s Motion For Judgment On The Administrative Record[.]").

The Solicitation incorporated three relevant Federal Acquisition Regulations ("FAR") provisions: FAR 28.203[2] (regarding the use of a surety); FAR 52.228-11[3] (regarding requirements of a surety); and FAR 52.228-15[4] (regarding surety and security bonds). AR 60–64.

---

[2] FAR 28.203, in relevant part, provides:

(a) An individual surety is acceptable for all types of bonds except position schedule bonds. The contracting officer shall determine the acceptability of individuals proposed as sureties, and shall ensure that the surety's pledged assets are sufficient to cover the bond obligation. . . .

(b) An individual surety must execute the bond, and the unencumbered value of the assets (exclusive of all outstanding pledges for other bond obligations) pledged by the individual surety, must equal or exceed the penal amount of each bond. . . .

(c) If the contracting officer determines that no individual surety in support of a bid guarantee is acceptable, the offeror utilizing the individual surety shall be rejected as nonresponsible[.]

48 C.F.R. § 28.203.

[3] FAR 52.228-11, in relevant part, provides:

(a) Offerors shall obtain from each person acting as an individual surety of the bid guarantee, a performance bond, or a payment bond—

(1) Pledge of assets; and

(2) Standard Form 28, Affidavit of Individual Surety.

(b) Pledges of assets from each person acting as an individual surety shall be in the form of—

(1) Evidence of an escrow account containing cash, certificates of deposit, commercial or Governmental securities, or other assets described in FAR 28.203-2 . . . ; and/or

(2) A recorded lien on real estate[.]

48 C.F.R. § 52.228-11.

[4] FAR 52.228-15, in relevant part, provides:

(d) Surety and other security for bonds. The bonds shall be in the form of firm commitment, supported by corporate sureties whose names appear on the list contained in Treasury Department Circular 570, individual sureties, or by other

On September 10, 2014, Anthem submitted a proposal in response to the August 11, 2014 RFP.  AR 130–56.  First Standard Asurety, LLLP ("First Standard') secured Anthem's proposal in the amount of $400,000 or 20% of the $2,000,000 proposal price.  AR 136–41.[5]  Anthem's proposal included an Irrevocable Trust Receipt ("ITR"), issued "from First Mountain Bancorp [("FMB")] trust secured with cash valued assets, including over $30 million in HSBC Bank as issued [certificates of deposit] held in escrow account by FMB at Northern Trust Bank in USA."  AR 138; *see also* AR 138–42 (Affidavit of Individual Surety).

On September 25, 2014, the CO issued an Obligation Request of $1,599,291 that stated, "Please obligate funds for Contract Number VA-786A-14-C-0031 [("Contract")] to be issued today for award to Anthem Builders, Inc. . . . .  to provide all labor, materials, equipment, tools, and supervision services necessary for renovat[ion of the] rostrum and roads per specification and drawings at Golden Gate National Cemetery in San Bruno[], CA."  AR 157.

On October 2, 2014, the CO requested that the Contract Specialist ("CS") "get [the] contract awarded to Anthem Builders, Inc., prior to the end of the day."  AR 225.  The CS responded that "she could if the checks on the contractor are okay."  AR 225.  When the CS reviewed Anthem's proposal, she questioned why: the bid bond listed "individual securities, while the securities listed were based on securities of a corporation and not an individual"; "corporate securities were not used because that is the securities that were put forward in the [Solicitation]"; "the name of the person listed on the individual bond was listed in [the System for Award Management ("SAM")] as ineligible for award"; and "the bonding company . . . did not appear on the Treasury's list of certified companies."  AR 225.  Consequently, the CS informed the CO that "she believed the bonds did not appear to be correct and/or enforceable."  AR 225.  The CO performed an Internet search on First Standard that returned negative information and then contacted Anthem's President, Kelly Moskalik, to inform him that Anthem "needed to provide a bid bond from the Treasury's approved list or provide individual securities in accordance with the FAR, such as cash or cashier's check."  AR 225.

On October 2, 2014, the CS and Mr. Moskalik spoke.  AR 225.  Mr. Moskalik agreed to provide another bond by October 6, 2014.  AR 225.  That same day, the CS confirmed this discussion by an email to Mr. Moskalik, emphasizing that Anthem's "proposal, as submitted, is

---

acceptable security such as postal money order, certified check, cashier's check, [ILC], or, in accordance with Treasury Department regulations, certain bonds or notes of the United States.

48 C.F.R. § 52.228-15(d); *see also* 48 C.F.R. § 52.228-15(b) (discussing the amount of required bonds); 48 C.F.R. § 52.228-15(c) (stating that contractors "shall furnish all executed bonds . . . to the [CO], within the time specified in the Bid Guarantee provision of the solicitation, or otherwise specified by the [CO], but in any event, before starting work.").

[5] Some documents refer to the proposal amount as approximately $1,600,000 (AR 134, 157), while others refer to it as $2,000,000 (AR 136).  This may be because the $400,000 surety is included in the $2,000,000 amount.

non-responsive" and including a link to a list of the Department of Treasury's approved sureties. AR 158.

On October 6, 2014, Mr. Moskalik sent a substitute bond by email, listing David Eugene Harris, as surety, and indicating that an original would be mailed that same day. AR 161–72. Mr. Moskalik recognized that David Eugene Harris was "not on the US Treasury list, since he is an Individual, and not a Corporate Surety," but added that David Eugene Harris was not the David Harris listed as an excluded vendor in the SAM. AR 161. Nevertheless, Mr. Moskalik stated that Anthem's bond met the requirements of FAR 28.203 and that David Eugene Harris "has demonstrated in the past to some of [Anthem's] other clients that the Trust Assets are verifiable and meet the legal requirements of the FAR." AR 161. That same day, the CS reviewed the substitute bond and determined that it still "appeared to be incorrect." AR 225.

On October 7, 2014, the CS "telephoned Mr. Moskalik and informed him that the bonds would be going to legal" for review. AR 225. On October 20, 2014, the DVA's Office of General Counsel ("OGC") informed the CS that the "bond is unacceptable because [Anthem does not] identify any real collateral" and that Anthem's bid should be "rejected as non-responsible per FAR 28-203C," i.e., (1) "[t]he assets are not identified"; (2) "[t]he assets have not been properly pledged or provided"; and (3) the OGC does not "know what the alleged assets are . . . and [has] no idea what is encumbered and what is[ not]." AR 225–26.

On October 22, 2014, the DVA "initiated a modification to de-obligate[6] the monies obligated . . . to zero out the award input into the system by Mr. Harris." AR 226; see also AR 219–20 (Modification of Contract). The de-obligation justification was that the "Contract Bonding was not acceptable." AR 220.

On October 28, 2014, an Award Determination Memorandum ("ADM") issued that determined Anthem's bid was non-responsible and awarded the Contract to E.C. Smith, Inc. AR 221–30.

On October 29, 2014, the de-obligation was completed. AR 232.

On October 30, 2014, the CS prepared a Memorandum For Record explaining the non-responsibility determination. AR 231–32.

On November 4, 2014, Robelto Joshua, the new acting CO, informed Mr. Moskalik that Anthem's "proposal does not offer the best value to the Government" and that the contract was awarded to E.C. Smith, Inc. AR 261; see also AR 215 (informing Mr. Moskalik that a new acting CO was appointed).

On November 10, 2014 and November 14, 2014, Mr. Moskalik requested a debriefing. AR 240–41. On November 19, 2014, the CO informed Mr. Moskalik that he "[b]elieve[d] Ms. Clark ha[d] already addressed this issue with [Anthem]. Bonding issues were the proximate cause . . . and without acceptable bonding, the Government cannot proceed with [the] award." AR

---

[6] The Amendment Of Solicitation/Modification Of Contract de-obligated the $1,599,291 in funds the DVA had set-aside for payment to Anthem under the Contract. AR 219–20.

240.  The CO also referred Mr. Moskalik to Department of Treasury's acceptable bonding and sureties listing.  AR 240.

On November 24, 2014, Mr. Moskalik sent a Protest Letter by email to the CO, stating that "[i]t is the contention of Anthem . . . that [Anthem is] being excluded from the award because they are utilizing a surety that is not listed on the Department of Treasury website as an acceptable Corporate Surety. . . .  [T]here is no provision in the [FAR] or [f]ederal contracting statutes that authorizes a [CO] to refuse to accept an individual surety for Payment or Performance Bonds."  AR 243.

On December 15, 2014, the CO responded to Anthem's November 24, 2014 Protest Letter, explaining the reasons why the DVA determined that the individual surety in Anthem's bid was unacceptable and Anthem's protest was denied.  AR 274–76.

## II.   RELEVANT PROCEDURAL HISTORY.

On December 23, 2014, Anthem ("Plaintiff") filed a Complaint ("Compl.") and a Motion For Preliminary Injunction ("Pl. Mot.") in the United States Court of Federal Claims.

On December 29, 2014, the court held a telephone status conference with the parties.  On December 30, 2014, the court entered a Scheduling Order.

On January 16, 2015, the Government filed an Unopposed Motion For Protective Order, a Notice Of Filing Administrative Record, and the Sealed Administrative Record.  *See, supra*, n.1.

On January 20, 2015, the court granted the Government's January 16, 2015 Unopposed Motion For Protective Order.

On January 28, 2015, Plaintiff filed a Motion For Summary Judgment ("Pl. Mot."), pursuant to Appendix C and Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").

On February 13, 2015, the Government filed a Motion For Judgment On The Administrative Record And Response To Plaintiff's Motion For Summary Judgment ("Gov't Mot."), as well as an Unopposed Motion To Amend/Correct The Administrative Record.

On February 18, 2015, the court granted the Government's February 13, 2015 Motion To Amend/Correct The Administrative Record.

On February 20, 2015, Plaintiff filed a Response to the Government's February 13, 2015 Motion For Judgment On The Administrative Record ("Pl. Resp.").

On February 27, 2015, the Government filed a Reply ("Gov't Reply").

## III.    DISCUSSION.

### A.    Jurisdiction.

The United States Court of Federal Claims is required to make a threshold determination regarding jurisdiction. *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) ("[A]t the outset [the court] shall determine . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating. If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare it has jurisdiction over the cause, and shall then proceed with the case in the normal course.").

Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

The December 23, 2014 Complaint alleges that the DVA's "determination that the Bid Bond furnished by the Individual Surety was not in compliance with the [FAR] is arbitrary, capricious, an abuse of discretion and not in accordance with the fact or the law." Compl. ¶ 31. Therefore, the December 23, 2014 Complaint alleges sufficient facts of a money-mandating claim to satisfy 28 U.S.C. § 1491(b)(1), as it places in issue violations of law or regulation "in connection with" the Solicitation.

### B.    Standing.

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("*Myers*") ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" under 28 U.S.C. § 1491(b)(1) as synonymous with "interested party" under CICA, 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition of "interested party" for 28 U.S.C. § 1491(b)(1) purposes). A two-part test is applied to determine whether a protestor is an "interested party:" the protestor must show that "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distrib. Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008) (citations omitted). In addition, to establish "interested party" status, a protestor must show the alleged errors in the procurement were prejudicial. *See Labatt Food Serv., Inc. v. United States* ("*Labatt*"), 577 F.3d 1375, 1378 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (internal citations and quotations omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing."). A party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of

securing the contract." *Labatt*, 577 F.3d at 1378.  Importantly, a proper standing inquiry must not conflate the requirement of "direct economic interest" with prejudicial error.  *Id.* at 1380 (examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful[]").

In this case, Plaintiff submitted a proposal in response to the Solicitation.  AR 106–56.  As an "actual bidder," Plaintiff satisfies the first element of the "interested party" test.  *See Distrib. Solutions, Inc.*, 539 F.3d at 1344.

As to the second element, *i.e.*, that a plaintiff "must show that it had a 'substantial chance' of winning the contract," Plaintiff has satisfied that element, because the DVA considered Plaintiff's bid competitive and initially intended to award the Contract to Plaintiff.  AR 157, 225.  Therefore, Plaintiff has met the second element of the "interested party" test by showing a "direct economic interest in the procurement."  *Distrib. Solutions, Inc.*, 539 F.3d at 1344.

As to prejudice, Plaintiff contends that the CO's decision was "arbitrary and unsupported" and that "the assets and security pledged by the individual surety met the requirements of the [FAR]."  Compl. ¶ 8.  The DVA's failure to accept security that complied with the Solicitation and the FAR would constitute an error that prejudiced Plaintiff, because "there is a 'substantial chance' [that Plaintiff] would have received the contract award but for the . . . error[] in the bid process."  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1358 (Fed. Cir. 2005) ("*Bannum*"); *see also Labatt*, 577 F.3d at 1378 (same).

For these reasons, the court has determined that Plaintiff has standing to seek an adjudication of this bid protest.

## C.    Standard of Review.

Pursuant to the Tucker Act, as amended by the Administrative Dispute Resolution Act, Pub. L. No. 104-320 § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996), the United States Court of Federal Claims is authorized to review challenges to agency decisions, pursuant to the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."); *see also* 5 U.S.C. § 706(2)(A) ("[T]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"); *Banknote Corp. of Am., Inc. v. United States,* 365 F.3d 1345, 1350 (Fed. Cir. 2004) ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citations omitted); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009) ("*Weeks Marine*") (same).

If a bid protest is based on a regulatory or procedural violation, *i.e.*, "not in accordance with law," our appellate court also has imposed an additional requirement that "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1381 (Fed. Cir. 2009) ("*Axiom*") (internal

quotations and citations omitted).  This burden is even greater when the procurement is a "best value" procurement.  *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("*Galen*") ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion . . . . [T]he relative merit of competing proposals is primarily a matter of administrative discretion.") (citations omitted); *see also TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327 (Fed. Cir. 1996) ("In determining whether the agency has complied with the regulation authorizing best value procurements, the [reviewing authority] may overturn an agency's decision if it is not grounded in reason.").

If an award decision is challenged because it was made without a rational basis, the trial court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (international citations and quotations omitted); *see also Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1287 (Fed. Cir. 2010) ("[W]e must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors.") (internal alterations, quotations, and citations omitted); *Weeks Marine*, 575 F.3d at 1368–69 ("We have stated that procurement decisions invoke highly deferential rational basis review . . . .  Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal alterations, quotations, and citations omitted).

In the alternative, if an award decision is challenged on the grounds that an agency acted in an arbitrary or capricious manner, the court may intervene "only in extremely limited circumstances."  *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1372 (Fed. Cir. 1983) ("*Grimberg*").  "Courts have found an agency's decision to be arbitrary and capricious when the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*")).

In this case, Plaintiff filed a Motion For Summary Judgment, and the Government filed a Motion For Judgment On The Administrative Record, requiring the court to conduct a proceeding akin to an expedited trial on the record.  *See* RCFC 52.1;[7] *see also Bannum*, 404 F.3d at 1356

---

[7] RCFC 52.1, in relevant part, provides:

**(c)  Motions for Judgment on the Administrative Record.**

**(1)  *Initial Motion*.**  Absent an order by the court establishing a different procedure, a party may move for partial or other judgment on the administrative record and must include in its motion or supporting memorandum a statement of facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the court.

("[T]he judgment on an administrative record is properly understood as intending to provide for an expedited trial on the record."). The existence of a material issue of fact, however, does not prohibit the court from granting a motion for judgment on the administrative record, although the court has not conducted an evidentiary proceeding. *See Bannum*, 404 F.3d at 1357 (authorizing the court to make "factual findings under RCFC [52.1][8] from the [limited] record evidence as if it were conducting a trial on the record").

### D.     Whether Anthem Builders, Inc.'s Bond Met The Standards For Individual Sureties Required By Federal Acquisition Regulations.

#### 1.     The Government's Argument.

The Government argues that Plaintiff's individual surety did not meet the standards set forth in 48 C.F.R. § 28.203 "for three reasons: (1) the revised bid bond did not properly identify assets; (2) the assets were not properly pledged or provided; and (3) any additional encumbrances on the assets were unknown." Gov't Mot. at 11 (citing AR 225–26).

Plaintiff's bond did not properly identify pledged assets, nor "sufficiently demonstrate that the [ITR] was an irrevocable letter of credit [("ILC")], and thus only cash or readily marketable assets could be used to satisfy the underlying bond obligations." Gov't Mot. at 11. Plaintiff "represent[ed] the assets as the [ITR] from First Mountain Bancorp trust secured with cash valued assets totaling over $1 Billion, including parts totaling over $30 million in HSBC Bank issued [certificates of deposit] held in escrow account by FMB." Gov't Mot. at 12 (citing AR 225). But, as the OGC concluded, "If the ITR itself is the asset, this is not acceptable. It is not in and of itself a cash equivalent and it is not an [ILC] issued by a federally insured financial institution." AR

---

(**2**) *Response.* A party opposing a motion based on the administrative record must include in any response a counterstatement of facts that similarly draws upon and cites to the administrative record.

RCFC 52.1(c)(1)–(2).

[8] In 2006, RCFC 56.1 "Review of a Decision on the Basis of the Administrative Record" was repealed and replaced with RCFC 52.1, to conform to the United States Court of Appeals for the Federal Circuit's decision in *Bannum*, 404 F.3d at 1354 (holding that the court should "make factual findings from the record evidence as if it were conducting a trial on the record"). *See* RCFC 52.1, 2006 Rules Committee Notes. "Summary judgment standards are not pertinent to judicial review upon the [A]dministrative [R]ecord." RCFC 52.1, 2006 Rules Committee Notes.

225.  Plaintiff's ITR also does not meet the definition of ILC in FAR 2.101,[9] because "the written commitment in the form of the ITR is from [FMB], which is not a federally insured financial institution" and "even if somehow [FMB] is FDIC insured, the ITR conditions payment" by providing for a forty-five day payment period.  Gov't Mot. at 12, 13 (citing 31 C.F.R. § 208.2(j) (defining insured financial institution as "any financial institution, the deposits of which are insured by the Federal Deposit Insurance Corporation under 12 U.S.C. Chapter 16"); AR 168 (noting the lack of a "FDIC Insured" seal on FMB's letterhead)).

Plaintiff's only identified assets were "cash/cash equivalents," but "the 'cash/cash equivalents' listed in the ITR were insufficiently pledged or provided so as to satisfy the FAR's requirements."  Gov't Mot. at 13.  Pursuant to FAR 52.228-11, "for an individual surety to be acceptable on a bid bond, the pledged assets must either be in an escrow account or a recorded lien on real estate—not, as [Plaintiff] suggests, in a different, unmentioned form."  Gov't Mot. at 14.  Because Plaintiff did not identify a recorded lien on real estate, FAR 52.228-11(b) requires that the assets be held in escrow.  Gov't Mot. at 14.  But "[t]he escrow account identified by [Plaintiff] did not meet the conditions of [FAR] 28.203-1(b),"[10] since the forty-five day payment period in the ITR "far exceed[s] any time period specified in a demand, and is insufficient under [FAR] 28.203-1(b)(1)(i)[11]."  Gov't Mot. at 15 (citing AR 168).  In addition, "[e]ven assuming that not all of the particulars of an escrow account needed to be listed in the bid bond, 'the terms and conditions [of the escrow account] must be acceptable to the [CO].'"  Gov't Mot. at 15 (quoting FAR 28.203-1(b)(1)).  In this case, "the CO was not comfortable with the terms and conditions of

---

[9] FAR 2.101, in relevant part, defines ILC as,

a written commitment by a federally insured financial institution to pay all or part of a stated amount of money, until the expiration date of the letter, upon the Government's (the beneficiary) presentation of a written demand for payment. Neither the financial institution not the offeror/contractor can revoke or condition the letter of credit.

48 C.F.R. § 2.101.

[10] FAR 28.201-(1)(b), in relevant part, provides that "the assets pledged . . . may be provided by one or a combination of the following methods: (1) An escrow account with a federally insured financial institution in the name of the contracting agency. . . .  (2) A lien on real property[.]"  48 C.F.R. § 28.203-1(b).

[11] FAR 28.203-1(b)(1)(i), in relevant part, provides:

The account must provide the [CO] the sole and unrestricted right to draw upon all or any part of the funds deposited in the account.  A written demand for withdrawal shall be sent to the financial institution by the [CO], after obtaining the concurrence of legal counsel, with a copy to the offeror/contractor and to the surety.

48 C.F.R. § 28.203-1(b)(1)(i).

the escrow account" and "exercised his discretion and determined that the individual surety was unacceptable as the assets were not properly pledged or provided." Gov't Mot. at 15.

In addition, there may have been unknown additional encumbrances on the assets. Gov't Mot. at 15–16. For example, the OGC did not know whether FMB had pledged the same assets for other sureties and projects, thereby failing to comply with FAR 28.203(b)'s requirement that the bid bond be "free from liens and encumbrances." Gov't Mot. at 16 (quoting FAR 28.203(b)).[12]

### 2.    Anthem Builders, Inc.'s Response.

Plaintiff responds that the individual surety bid bond complies with the FAR and federal common law requirements concerning letters of credit, and that the assets were properly identified, pledged, and free from encumbrances. Pl. Mot. at 8–15; *see also* Pl. Resp. at 7–12.

FAR 28.203(b)(1) does not impose any requirements on Plaintiff's ITR. Pl. Mot. at 11 ("[FAR 28.203-1(b)] states that the asset 'may . . . be provided in one or a combination of the following methods'" and "does not state that [bonds] have to comply with all of the provisions listed, or that they have to comply with any of the suggested methods.") Thus, pursuant to FAR 2.101 and 28.204-3, as well as the Uniform Commercial Code ("U.C.C.") Sections 5-102(a)(10),[13]

---

[12] The December 23, 2014 Complaint also alleges that the DVA failed to comply with FAR 28.203(f). Compl. ¶ 29 (citing 48 C.F.R. § 28.203(f) ("[CO]s shall obtain the opinion of legal counsel as to the adequacy of documents pledging the assets prior to accepting the bid guarantee and payment and performance bonds.")). But, the parties' briefs do not address this issue further, and the CO clearly obtained the OGC's opinion that Plaintiff was non-responsible. AR 225.

[13] U.C.C. Section 5-102(a)(10) provides:

"Letter of credit" means a definite undertaking that satisfies the requirements of Section 5-104 by an issuer to a beneficiary at the request or for the account of an applicant or, in the case of a financial institution, to itself or for its own account, to honor a documentary presentation by payment or delivery of an item of value.

U.C.C. § 5-102(a)(10) (2002).

5-104,[14] and 5-108,[15] Plaintiff's individual surety should be considered an ILC.  Pl. Mot. at 9–10 (stating that the individual surety complies with the FAR and U.C.C. requirements on letters of credit, because the Affidavit of Individual Surety and ITR were authenticated and issued in accordance with the FAR's requirements for ILCs); *see also* Pl. Resp. at 9 (stating that the ITR "fulfills all of the requirements of the FAR and the [U.C.C.] to be considered equivalent to an [ILC]"); Pl. Resp. at 8–9 (the U.C.C. has been adopted in forty-nine states and has been cited favorably by the United States Supreme Court, as well as other federal courts).  For example, Plaintiff cites the Eastern District of Michigan's holding that an "ITR [from FMB is] a 'letter of credit.'"  Pl. Resp. at 9–10 (citing *Macomb Cnty. Bd. of Comm'rs v. StellarOne Bank*, 2010 WL 891247, at *2 (E.D. Mich. Mar. 10, 2010)).

In this case, the assets were properly identified as "certificates of deposit issued by a federally insured financial institution (HSBC Bank) and held in trust in Northern Trust Bank, another federally insured institution."  Pl. Resp. at 10.  Therefore, "whether the ITR is or is not considered an [ILC] . . . , the bonds are still supported by assets that meet the FAR definition of 'cash or readily marketable assets' in the form of [certificates of deposit]."  Pl. Resp. 10; *see also* Pl. Mot. at 12–14 (same).

The assets also properly were pledged.  Pl. Resp. at 10 (citing AR 208).  The ITR states that the DVA "had the unrestricted right to draw against the [certificates of deposit] up to the penal sum," without conditions, and the forty-five day processing time "did not restrict the Government's right to demand payment."  Pl. Resp. at 10, 11.  Moreover, the CO "never requested a list of the terms and conditions," and these "are never initially provided in a bid bond and are normally never requested."  Pl. Resp. at 11.  "If the [CO] had questions[,] he could request more information and it would have been provided."  Pl. Resp. at 11.

Finally, if COs required more detail than a statement that the assets are "free from liens and encumbrances of any kind whatsoever," "the contracting process would be unduly exacerbated."  Pl. Resp. at 12 (citing AR 210).

### 3.    The Government's Reply.

In reply to Plaintiff's argument that HSBC, a federally insured institution, held the cash or cash equivalents in escrow, the Government insists that "the [ILC] itself must be issued by a

---

[14] U.C.C. Section 5-104 provides:

A letter of credit, confirmation, advice, transfer, amendment, or cancellation may be issued in any form that is a record and is authenticated (i) by a signature or (ii) in accordance with the agreement of the parties or the standard practice referred to in Section 5-108(e).

U.C.C. § 5-104 (2002).

[15] U.C.C. Section 5-108, in relevant part, states that "an issuer shall honor a presentation that . . . appears on its face strictly to comply with the terms and conditions of the letter of credit." U.C.C. § 5-108(a) (2002).

federally insured financial institution." Gov't Reply at 5 (citing 48 C.F.R. § 28.204-3(b); 48 C.F.R. § 2.101). "HSBC did not issue the ITR; rather, First Standard—a non-federally insured financial institution—issued the ITR. Arguing that the ITR's assets are held in a federally insured financial institution does not bypass the requirement set forth in the FAR that the issuing institution be federally insured." Gov't Reply at 5.

In reply to Plaintiff's argument that the cash or cash equivalents listed in the ITR are acceptable assets, the Government adds that "[S]ection 7(b) of the Affidavit of Individual Surety . . . stated that the assets were the ITR itself," and not the assets in the HSBC escrow account. Gov't Reply at 6 (citing AR 196). In addition, the CO was not obligated to inquire about the terms and conditions of the escrow account, because "the CO is the arbiter of determining the extent of the information he needs to make an informed responsibility determination, . . . . [e]specially where, as here, the terms and conditions of the escrow account where unacceptable on the face of the ITR." Gov't Reply at 8 (citing *John C. Grimberg Co., Inc. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) ("*John C. Grimberg*") ("Although FAR 9.105-1(a) does require the [CO] to have, or to obtain, enough information to make a responsibility determination, the [CO] is the arbiter of what, and how much, information he needs.")). Similarly, the ITR states "that the document itself is free from liens and encumbrances, rather than the assets described earlier in the document," and "this indicates an intentional distinction" between the ITR and the assets. Gov't Reply at 9.

### 4.    The Court's Resolution.

Pursuant to FAR 52.228-15(d), bonds must be supported by "corporate sureties . . . list[ed] . . . in Treasury Department Circular 570, individual sureties, or by other acceptable security such postal money order, certified check, cashier's check, [ILC], or . . . certain bonds of the United States." 48 C.F.R. § 52.228-15(d). Each of three requirements is addressed herein.

### a.    Whether Anthem Builders, Inc.'s Bond Properly Was Supported By A Corporate Surety Listed In Treasury Department Circular 570.

First, Plaintiff's bonding company, First Standard, is not listed as a corporate surety on Treasury Department Circular 570.[16] Therefore, Plaintiff's bond was not supported by a corporate surety listed in Treasury Department Circular 570.

### b.    Whether Anthem Builders, Inc.'s Bond Properly Was Supported By An Individual Surety.

Second, the court must determine whether Plaintiff's bond satisfied the requirements for an individual surety. Pursuant to FAR 52.228-11(a), Plaintiff properly pledged assets and submitted Standard Form 28, Mr. Harris's Affidavit of Individual Surety. AR 206–09. Pursuant

---

[16] U.S. DEP'T OF TREASURY, BUREAU OF THE FISCAL SERV., DEP'T OF TREASURY'S LISTING OF CERTIFIED COMPANIES, *available at* http://fiscal.treasury.gov/fsreports/ref/suretyBnd/c570-certified-comp-07-01-14.pdf (last visited Mar. 10, 2015).

to FAR 52.228-11(b), the pledged assets must be in the form of either "(1) [e]vidence of an escrow account containing cash, certificates of deposit, commercial or Governmental securities, or other assets described in FAR 28.203-2 . . . ; and/or (2) [a] recorded lien on real estate."   48 C.F.R. § 52.228-11(b).  Therefore, Plaintiff complied with FAR 52.228-11(b)(1), by providing Mr. Harris's Affidavit of Individual Surety that the ITR from FMB was a "trust secured with cash valued assets totaling over $1 Billion, including parts totaling over $30 million in HSBC Bank issued [certificates of deposit] held in escrow account by FMB at Northern Trust Bank in USA." AR 208.  Thus, Plaintiff's bond complied with FAR 52.228-11(b).

But, FAR 28.203, 28.203-1, and 28.203-2 further limit the acceptability of individual sureties.  *See* 48 C.F.R. §§ 28.203, 28.203-1, 28.203-2.[17]  First, FAR 28.203 grants the CO discretion to "determine the acceptability of individuals proposed as sureties" and to reject "the offeror utilizing the individual surety . . . as nonresponsible."  48 C.F.R. § 28.203(a), (c); *see also* 48 C.F.R. § 28.203-1(b)(1) (stating that the terms and conditions of the escrow account "must be acceptable to the [CO]").[18]

FAR 28.203-1(b)(1)(i) requires that the escrow account "provide the contracting officer the sole and unrestricted right to draw upon all or part of the funds."  48 C.F.R. § 28.203-1(b)(1)(i).  The Government argues that the forty-five day payment period in the ITR "far exceed[s] any time period specified in a demand" and thus fails to provide the CO with the sole and unrestricted right to draw funds.  Gov't Mot. 15.  FAR 52.228-15(c) governs the timing of the submission of bonds and states that contractors "shall furnish all executed bonds . . . to the [CO], within the time specified in the Bid Guarantee provision of the solicitation, or otherwise specified by the [CO], but in any event, before starting work."  48 C.F.R. § 52.228-15(c).  In this case, the Bid Guarantee provision of the Solicitation, in relevant part, states:

If the successful bidder, upon acceptance of its bid by the Government within the period specified for acceptance, fails to execute all contractual documents or

---

[17] FAR 28.203-2(a) provides, "The Government will accept only cash, readily marketable assets, or [ILCs] from a federally insured financial institution from individual sureties to satisfy the underlying bond obligations."  48 C.F.R. § 28.203-2(a); *see also* 48 C.F.R. § 28.203-2(b) (listing the acceptable assets as "[c]ash, or certificates of deposit, or other cash equivalents with a federally insured financial institution"; "United States Government securities at market value"; "[s]tocks and bonds actively traded on a national U.S. security exchange with certificates issued in the name of the individual surety"; "real property owned in fee simple by the surety without any form of concurrent ownership"; and "[ILCs] issued by a federally insured financial institution in the name of the contracting agency and which identify the agency and solicitation or contract number for which the ILC is provided"); *see also* 48 C.F.R. § 28.203-2(c) (listing unacceptable assets as including "[n]otes or accounts receivable"; "[f]oreign securities"; certain forms of real property; "[p]ersonal property other than that listed in paragraph (b)"; "[s]tocks and bonds of the individual surety in a controlled, affiliated, or closely held concern of the offeror/contractor"; "[c]orporate assets"; "[s]peculative assets"; and "[l]etters of credit").

[18] For a discussion of whether the contracting officer abused this discretion, see Section III.E below.

furnish executed bond(s) within [ten] days after receipt of the forms by the bidder, the [CO] may terminate the contract for default.

AR 73.

Therefore, on its face, the forty-five day period specified in the ITR exceeds the ten-day period in the Bid Guarantee provision of the Solicitation. *Compare* AR 193 (ITR) *with* AR 73 (Bid Guarantee provision). Further, there is also no indication in the Administrative Record that the CO specified another time period. Therefore, the court has determined that the forty-five day period for payment under the ITR exceeds the time period in the Bid Guarantee provision of the Solicitation, thereby violating FAR 28.203-1(b)(1)(i)'s requirement that the escrow account "provide the contracting officer the sole and unrestricted right to draw upon all or part of the funds." 48 C.F.R. § 28.203-1(b)(1)(i).[19]

In addition, FAR 28.203-2(a) states that "the Government will accept only cash, readily marketable assets, or [ILCs] from a federally insured financial institution from individual sureties to satisfy the underlying bond obligations." 48 C.F.R. § 28.203-2(a); *see also* 48 C.F.R. § 28.203-2(b) (listing acceptable assets); 48 C.F.R. § 28.203(c) (listing unacceptable assets). Given the acceptable assets listed in FAR 28.203-2(b), Plaintiff's bond only could qualify as "[ILCs] issued by a federally insured financial institution in the name of the contracting agency and which identify the agency and solicitation or contract number for which the ILC is provided" or "[c]ash, or certificates of deposit, or as other cash equivalents with a federally insured financial institution." 48 C.F.R. § 28.203-2(b)(5), (1). These alternatives also are addressed herein.

### i.      Whether Anthem Builders, Inc.'s Bond Properly Was Supported By An ILC.

FAR 28.203-2 provides that "[t]he Government will accept . . . . [ILCs] issued by a federally insured financial institution in the name of the contracting agency and which identify the agency and solicitation or contract number for which the ILC is provided." 48 C.F.R. § 28.203(a), (b)(5).

In this case, the ITR was issued in the name of the contracting agency and identified the Solicitation No. VA-786A-14-R-0047. AR 168, 193. But, FMB is not a FDIC insured financial institution.[20]      FED. DEPOSIT INS. CO., INDUSTRY DIRECTORY, *available      at*

---

[19] The court recognizes that there may be a scenario where the payment could be made within the ten-day period in the Bid Guarantee provision. For example, Plaintiff could have sent an invoice for the ITR on the ITR's date of issue, October 7, 2014 (note that the Date of Maturity is January 7, 2014, which may affect the availability of funds), making payment due forty-five days later on November 21, 2015. Under this scenario, if Plaintiff received the forms from the bidder after November 11, 2015, then the ITR could have been paid before the expiration of the time period in the Bid Guarantee provision. But, there is no indication in the AR that Plaintiff invoiced the ITR or that the DVA ever sent the forms to Plaintiff.

[20] Although the District Court in *Macomb County* held that an ITR from FMB was a letter of credit, this determination was derived from Michigan's version of Article 5 of the U.C.C. and

https://www2.fdic.gov/idasp/main.asp (last visited Mar. 10, 2015) (finding no results when searching for "First Mountain Bancorp," only one different bank when searching for "First Mountain," and no results when searching "First Standard"); *see also* 31 C.F.R. § 208.2(j) (defining insured financial institution as "any financial institution, the deposits of which are insured by the Federal Deposit Insurance Corporation[.]; AR 168, 193 (there was no "FDIC Insured" seal on FMB's letterhead). Because the ITR was not "issued by a federally insured financial institution," the ITR is not an ILC. 48 C.F.R. § 28.203-2(b)(5).[21]

Therefore, Plaintiff's bond was not properly supported by an ILC.[22]

### ii.   Whether Anthem Builders, Inc.'s Bond Properly Was Supported By Cash Or Cash Equivalents.

FAR 28.203-2 provides that "[t]he Government will accept . . . . [c]ash, or certificates of deposit, or other cash equivalents with a federally insured financial institution." 48 C.F.R. § 28.203-2(a), (b)(5); *see also* 48 C.F.R. § 52.228-15(d) (stating that the bonds may be "in the form of firm commitment, supported by corporate sureties whose names appear on the list contained in Treasury Department Circular 570, individual sureties, or by other acceptable security such as postal money order, certified check, cashier's check, [ILC], or, in accordance with Treasury Department regulations, certain bonds or notes of the United States"); 48 C.F.R. § 52.228-11(b) ("Pledges of assets from each person acting as an individual surety shall be in the

---

is not precedential. *See* 2010 WL 891247, at *2 ("Under Michigan's version of Article 5 of the U.C.C., the ITR is defined as a letter of credit.") (citing Mich. Comp. Laws § 440.5102(j) (noting that the state statute does not require that the letter of credit be insured by FDIC, thereby distinguishing the statute from 48 C.F.R. § 2.101)). Moreover, Section 5-108(e) does not require that the letter of credit be issued or confirmed by a federally insured financial institution. *See* U.C.C. § 5-108(e) (2002) (stating that "[a]n insurer shall observe standard practice[s] of financial institutions that regularly issue letters of credit").

[21] Plaintiff could have argued that the "$30 million in HSBC Bank as Issued [certificates of deposit] held in escrow account by FMB at Northern Trust Bank in USA" qualified the ITR as an ILC confirmed by HSBC. *See* 48 C.F.R. § 28.204-3(b) (stating that the ILC must be "issued/*confirmed* by an acceptable federally insured financial institution as provided in paragraph (g) of this subsection") (emphases added); *see also* FED. DEPOSIT INS. CO., INDUSTRY DIRECTORY, *available at* https://www2.fdic.gov/idasp/main.asp (last visited Mar. 10, 2015) (finding two results when searching for "HSBC" and one result when searching for "Northern Trust"). But, Plaintiff did not do so and thus waived the argument. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (stating that it is "well established that arguments not raised in the opening brief are waived"). In any event, there is no evidence in the Administrative Record that Plaintiff "provide[d] the [CO] a credit rating from a recognized commercial rating service that indicates the financial institution has the required rating(s) as of the date of issuance of the ILC." 48 C.F.R. § 28.204-3(g)(1).

[22] In addition, as discussed above, the forty-five day payment period in the ITR conditions the letter of credit.

form of—(1) Evidence of an escrow account containing cash, certificates of deposit, commercial or Governmental securities, or other assets described in FAR 28.203-2[.]").

In this case, the parties dispute whether the ITR must be issued by a "federally insured financial institution," or whether the certificates of deposit issued by HSBC and held in escrow at Northern Trust Bank—both of which are "federally insured financial institution[s]"—are sufficient. *Compare* Pl. Resp. at 10 (stating that the Government "appears to ignore that the Affidavit of Individual Surety . . . states specifically that the [certificates of deposit] are being held i[n] an escrow account at Northern Trust Bank, which is a federally insured financial institution") (citing AR 208)) *with* Gov't Reply at 6 (arguing that the ITR is an asset, not the certificates of deposit).

FAR 28.203-2 does not clearly resolve this issue. *Compare* 48 C.F.R. § 28.203-2(a) (requiring that the cash, readily marketable, assets, or ILCs be "*from* a federally insured financial institution") (emphasis added) *with* 48 C.F.R. § 28.203-2(b)(1) (stating that "[c]ash, or certificates of deposit, or other cash equivalents *with* a federally insured financial institution" are acceptable assets) (emphasis added).[23] Moreover, FAR 52.228-11(b) requires only "*evidence of* an escrow account containing cash, certificates of deposit, commercial or Governmental securities, or other assets described in FAR 28.203-2[.]" 48 C.F.R. § 52.228-11(b)(1) (emphasis added). In this case, Plaintiff has shown "evidence of an account containing . . . certificates of deposit" (48 C.F.R. § 28.203(b)(1)) that are "with a federally insured financial institution" (48 C.F.R. § 28.203-2(b)(1)); AR 138 (stating that the ITR was issued "from First Mountain Bancorp [("FMB")] trust secured with cash valued assets, including over $30 million in HSBC Bank as issued [certificates of deposit] held in escrow account by FMB at Northern Trust Bank in USA").

But, Plaintiff failed to show that the assets were "unencumbered." 48 C.F.R. § 28.203(b). The ITR asserts only that the ITR, and not the HSBC certificates of deposit held at Northern Trust, are "free from encumbrances." AR 193 ("FMB certified that *this ITR* is . . . free from liens and encumbrances of any kind whatsoever.") (emphasis added). Therefore, the individual surety did not comply with the FAR, and the CO properly exercised his authority in determining that the assets may not have been unencumbered. *See* 48 C.F.R. § 28.203(a)–(b).

---

[23] In FAR 28.203-2(b)(1), the phrase "with a federally insured financial institution" applies to all three asset types: "[c]ash"; "certificates of deposit"; and "other cash equivalents." 48 C.F.R. § 28.203-2(b)(1); *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147–51 (2012) ("READING LAW") (discussing the "Series-Qualifier Canon" that provides: "When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier *normally applies to the entire series*.") (emphasis added). But, the inclusion of the "or" before "certificates of deposit" could imply that the phrase "with a federally insured financial institution" applies only to "other cash equivalents," and not to "cash" or "certificates of deposit." *See United States v. Pritchett*, 470 F.2d 455, 459 (D.C. Cir. 1972) (holding that a similar postpositive phrase did not apply to all positions listed in that clause due to the presence of an "or" before the position at issue). *But see* READING LAW 150 ("The [*Pritchett*] court was right about the result and the comma, but it was the *to* rather than the *or* that set the last phrase apart.") (emphasis in original).

**E.    Whether The Department Of Veterans Affairs' Review of Anthem Builders Inc.'s Bond Violated the Administrative Procedures Act.**

**1.    The Government's Argument.**

The Government argues that the CO did not violate the APA[24] by: determining that Plaintiff's individual surety did not comply with the FAR; considering the SAM record; or considering the Internet search.  Gov't Mot. at 9–23; *see also* Gov't Reply at 9–16.

The Government's arguments that Plaintiff's individual surety did not comply with the FAR, have been discussed and resolved.  Regarding the SAM search, the Government argues that the CO conducting the SAM search and did not evidence bad faith.  Gov't Mot. at 16–18; *see also* Gov't Reply at 12–15.  According to FAR 9.105-1(a), the CO must "possess or obtain information" necessary to make a responsibility or nonresponsibility determination, and that information must be included in the contract file.  Gov't Mot. at 16–17 (citing 48 C.F.R. § 9.105-1(a); 48 C.F.R. § 9.105-2(a)); *see also* Gov't Reply at 13 (same).  The CO's decision to run the SAM search on the individual surety was proper, as the SAM search is one of the items that could be considered when making a responsibility decision under FAR 9.105[-1](c).[25]  In addition, since the search was conducted, the results were required to be included in the file pursuant to Section 9.105-2(b)."[26]

---

[24] The Government's February 13, 2015 Motion relies on the same arguments in support of its contention that the DVA did not violate the APA's "arbitrary or capricious" or "not in accordance with the law" standards (Gov't Mot. at 9–20), but separately addresses the "rational basis" standard (Gov't Mot. at 20–23).  The Government's February 27, 2015 Reply jointly addresses the "arbitrary or capricious" and "not in accordance with the law" standards (Gov't Reply at 9–15) and separately argues that the court should defer to the DVA's determination (Gov't Reply at 16–17).  But, the court will address separately the "arbitrary or capricious," "rational basis," and "not in accordance with the law" standards in its resolution.

[25] FAR 9.105-1(c), in relevant part, provides:

In making the determination of responsibility, the [CO] shall consider information in FAPIIS . . . , including information that is linked to FAPIIS such as from the [SAM] Exclusions and the Past Performance Information Retrieval System (PPIRS), and any other relevant part performance information[.]

48 C.F.R. § 9.105-1(c).

[26] FAR 9.105-2(b), in relevant part, provides that when making a responsibility or nonresponsibility determination, the CO must provide the following support documentation:

(1) Documents and reports supporting a determination of responsibility or nonresponsibility, including any preaward survey reports, the use of FAPIIS information . . . , and any applicable Certificate of Competency, *must* be included in the contract file.

Gov't Mot. 17.  Moreover, although Mr. Moskalik assured the DVA that Plaintiff's individual surety was not the same David Harris identified in the SAM search, he did so after the search was conducted, so the CO did not rely on Mr. Moskalik's assurances.  Gov't Mot. at 17 (citing AR 161); *see also* Gov't Reply at 14 ("[E]ven though Mr. Moskalik also provided the CO with copies of Mr. Harris's passport, driver's license[,] and Georgia firearms license, the excluded David Harris[] could have moved to Georgia after exclusion, or could have had a second residence or workplace in Illinois.") (internal quotation omitted).

Plaintiff also "identifies no evidence that the DVA had a specific intent to injure it," beyond including this required information.  Gov't Mot. at 18 (citing *Galen*, 369 F.3d at 1330 (stating that there is a "presumption of good faith" on behalf of the Government); *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1240 (Fed. Cir. 2002) ("*Am-Pro*") (stating that a plaintiff claiming bad faith must show "irrefragable proof," *i.e.*, "some specific intent to injure the plaintiff") (internal quotation omitted)).  It is a "nonissue" that another agency purportedly accepted First Standard as an individual surety, because the DVA was not bound by other agencies' prior actions.  Gov't Mot. at 18.  And, Plaintiff cannot show that it was prejudiced by the search. Gov't Reply at 14 (stating that the CO "questioned the bid bond on its face—not because of the SAM search results"); Gov't Reply at 15–16 (arguing that Plaintiff cannot show prejudicial error).

The court also may not consider Plaintiff's counsel's subsequent Internet search.  Gov't Mot. at 19.  "Anecdotal evidence of a Google search performed by [Plaintiff]'s counsel several months after the award determination is not properly part of the [A]dministrative [R]ecord." Gov't Mot. at 19 (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the [A]dministrative [R]ecord already in existence, not some new record made initially in the reviewing court."); *Axiom*, 564 F.3d at 1380 (limiting the supplementation of the Administrative Record "to cases in which the omission of the extra-record evidence precludes effective judicial review") (internal quotation omitted)).  In any event, "[t]hese [I]nternet search results were not heavily relied upon when the CO made his responsibility determination" and any "oversight is a *de minimis* error which caused no harm to [Plaintiff]."  Gov't Mot. at 20; *see also* Gov't Reply at 11–12 (arguing that the DVA's nonresponsibility determination relied heavily on the OGC's recommendation that did not mention the Internet search results and that the Internet search was not a document or report that needed to be included in the contract file); Gov't Reply at 15–16 (arguing that Plaintiff cannot show prejudicial error).

## 2.    Anthem Builders, Inc.'s Response.

The CO abused its discretion by finding Plaintiff non-responsible, conducting the SAM search, and conducting the Internet search.  Pl. Mot. at 14–16, 5–7.  The DVA's "actions were

---

. . . .

(2) (ii) The [CO] is responsible for the timely submission, within 3 working days, and sufficiency, and accuracy of the documentation regarding the nonresponsibility determination."

48 C.F.R. § 9.105(b) (emphasis added).

arbitrary, capricious, not in accordance with regulations, and just plain wrong." Pl. Resp. at 3.[27] Specifically, the inclusion of the SAM and Internet search results violated 48 C.F.R. § 9.105-2(b)(2)(ii). Pl. Resp. at 4–5.

On October 6, 2014, the CO was notified that the David Harris identified in the SAM search was not the same David Harris serving as Plaintiff's individual surety. Pl. Mot. at 6; *see also* Pl. Resp. at 4 (same) (citing AR 161, 191, 200, 203, 216). On October 26, 2014, twenty days after this notification, the CO issued the ADM, and "[t]here is no evidence in the [Administrative Record] that the [CO] ever fact checked the information." Pl. Resp. at 4 (citing AR 221). In addition, Plaintiff provided a copy of Mr. Harris's "passport, driver's license[,] and Georgia Firearms License . . . [that a]ll showed that he lived in Georgia and not the three other states indicated in the SAM." Pl. Resp. at 5 (citing AR 213–14). But, the CO still "allowed the incorrect information to remain in the [ADM]." Pl. Resp. at 5 (citing AR 225).

Regarding Plaintiff's counsel's independent Internet search, "[t]here is absolutely no information concerning any fraud perpetrated by First Standard. . . . When asked about supporting documentation[,] the [DVA] could not produce any." Pl. Mot. at 7; *see also* Pl. Resp. at 5 ("There was no support documentation offered and none was presented in the Administrative Record. Plaintiff's counsel personally requested from [the Government]'s counsel any supporting documentation for this statement and was told that none existed."). While CO's are permitted to conduct Internet research, "the information must be accurate." Pl. Resp. at 5.

The inclusion of the CO's SAM and Internet search results were not *de minimis* errors. Pl. Resp. at 5–7. "No matter what the [Government] argues, the inclusion of this incorrect and unsubstantiated information amounts to the ringing of the bell that could not be unrung and had to have an effect on the award." Pl. Resp. at 6. Moreover, "[i]t was only after the CO reviewed the SAM data and drew his inaccurate and false conclusions that the award and the bid bond were questioned." Pl. Resp. at 6. Finally, "[t]he Comptroller General has not been reluctant to overturn awards that were based on incorrect information." Pl. Resp. at 6–7 (citing, for example, *L-3 Commc'ns Corp.*, B-281784.3 *et. al*, 1999 CDP ¶ 81 (Comp. Gen. April 26, 1999)).

### 3.    The Court's Resolution.

#### i.    Whether The Department Of Veterans Affairs Violated The APA By Determining That Anthem Builders, Inc.'s Bond Did Not Meet The Standards For Individual Sureties Required By The FAR.

The APA requires that the court "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2); *see also* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in

---

[27] Plaintiff does not distinguish between the "arbitrary or capricious," "rational basis," or "not in accordance with the law" standards. Pl. Resp. at 3–6. But, the court will separately address these standards in its resolution.

section 706 of title 5.").  The court has determined that the DVA's nonresponsibility determination accorded with the FAR, and the court will rely on this determination in considering whether the DVA's decision violated the APA.

To establish a regulatory or procedural violation, *i.e.*, procurement not in accordance with law, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."  *Axiom*, 564 F.3d at 1381 (internal quotations and citations omitted).  Because the court previously determined that that the DVA's nonresponsibility determination accorded with the FAR, the court has determined that the procurement did not violate an applicable law or regulation.

To establish a lack of a rational basis, a plaintiff must show that the agency failed to reduce to writing a "rational reasoning and consideration of relevant factors."  *Savantage Fin. Servs.*, 595 F.3d at 1287 (internal quotation omitted).  In this case, the OGC thoroughly evaluated Plaintiff's bond and determined it was unacceptable, as explained in the text of the OGC's October 20, 2014 email reproduced in the ADM.  AR 225; *see also* 48 C.F.R. § 28.203(f).  Therefore, the DVA had a "rational basis" in finding Plaintiff's bid bond unacceptable pursuant to the FAR.  *See Bannum*, 404 F.3d at 1355, 1357 (requiring the United States Court of Federal Claims to "weigh[] the evidence" of procurement errors "as if it were conducting a trial on the record"); *see also Weeks Marine*, 575 F.3d at 1368–69 ("[P]rocurement decisions invoke[] highly deferential rational basis review . . . .  Under that standard, we sustain an agency action evincing rational reasoning and consideration of relevant factors.") (internal quotations and citations omitted); *Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (requiring the court to "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis") (internal citations and quotations omitted).

And, to overturn an award decision as arbitrary or capricious, the court must determine that the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *State Farm*, 463 U.S. at 43; *see also Grimberg*, 702 F.2d at 1372 (holding that the court may set aside agency action "only in extremely limited circumstances").  The Administrative Record evidences that the DVA thoroughly considered the evidence and reasonably determined that Plaintiff's bond did not comply with the FAR's requirements.  AR 225.  Therefore, the DVA's decision was not arbitrary or capricious.

For these reasons, the court has determined that the DVA's nonresponsibility determination was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4).

### ii. Whether The Department Of Veterans Affairs Violated The Administrative Procedures Act By Including The System For Award Management Search Results.

FAR 9.105-1(c) provides that, "the [CO] shall consider information in FAPIIS . . . , including information that is linked to FAPIIS such as from the [SAM] Exclusions[.]"

48 C.F.R. § 9.105-1(c).  FAR 9.105-2(b)(1) also provides that this information "*must* be included in the contract file."  48 C.F.R. § 9.105-2(b)(1) (emphasis added).  In this case, the Administrative Record evidences that the CO properly conducted a SAM search and then was required to include this information in the contract file.  AR 225.  In addition the Administrative Record demonstrates that the DVA primarily relied on the acceptability of the bond, not on the SAM search results, when making the nonresponsibility determination.  AR 225, 231–32 (discussing the OGC's recommendation and concerns with the bond rather than the SAM search results).  Therefore, any error in including the SAM search in the contract file would be nonprejudicial.  *See Bannum*, 404 F.3d at 1358 (requiring a showing that "there [is] a 'substantial chance' [that Plaintiff] would have received the contract award but for the . . . error[] in the bid process"); *see also Labatt*, 577 F.3d at 1378 (same).

For these reasons, the court has determined that the DVA's inclusion of the SAM search results was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4).

### iii.   Whether The Department Of Veterans Affairs Violated The APA By Including The Internet Search Results.

Finally, FAR 9.105-1(a) requires the CO to "possess or obtain information sufficient to be satisfied that a prospective contractor" meets the requirements of an individual surety.  48 C.F.R. § 9.105-1(a).  Plaintiff concedes that the CO was permitted to conduct an Internet search.  Pl. Resp. at 5.  But, the DVA was not required to include copies of the results of the Internet search in contract file.  *See* 48 C.F.R. § 9.105-2(b)(1) (limiting the required supporting documentation to "[d]ocuments and reports").  In addition, the Administrative Record evidences that the DVA focused primarily on the acceptability of the bond, not on an Internet search, when making the nonresponsibility determination, rendering any error in referencing the Internet search results nonprejudicial.  AR 225, 231–32 (discussing the OGC's recommendation and concerns with the bond rather than the Internet search results); *see also Bannum*, 404 F.3d at 1358 (requiring a showing that "there [is] a 'substantial chance' [that Plaintiff] would have received the contract award but for the . . . error[] in the bid process"); *see also Labatt*, 577 F.3d at 1378 (same).

For these reasons, the court has determined that the DVA's reference to an Internet search results was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A); *see also* 28 U.S.C. § 1491(b)(4).

### iv.   Whether The Department Of Veterans Affairs Violated Its Duty Of Good Faith And Fair Dealing.

Certain allegations in Plaintiff's January 28, 2015 Motion For Summary Judgment could be construed as arguments that the DVA violated its duty of good faith and fair dealing.  *See, e.g.*, Pl. Mot. at 6 (stating that, by including the SAM search, the CO "injected false information into the [ADM], knowing that it was false"); Pl. Mot. at 7 (stating that, by including the Internet search in the ADM, the Government alleged that Plaintiff had committed fraud without providing supporting documentation); *see also Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) ("The covenant of good faith and fair dealing imposes obligations on both contracting parties that include the duty not to interfere with the other party's performance and not to act so as

to destroy the reasonable expectations of the other party regarding the fruits of the contract.") (internal quotation, alterations, and emphasis omitted); RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). But, to the extent that these allegations are construed to allege a violation of the duty of good faith and fair dealing, Plaintiff has not shown that the DVA had "some specific intent to injure the plaintiff." *Am-Pro*, 281 F.3d at 1240 (internal quotation omitted). Therefore, the presumption of good faith by the Government remains. *See Galen*, 369 F.3d at 1330 (stating that there is a "presumption of good faith" on behalf of the Government).

## IV.    CONCLUSION.

For reasons discussed herein, Plaintiff's December 23, 2014 Motion For Preliminary Injunction and January 28, 2015 Motion Summary Judgment are denied. The Government's February 3, 2015 Motion For Judgment On The Administrative Record is granted. *See* RCFC 52.1. Accordingly, the Clerk is direct to enter judgment on behalf of the Government.

No costs.

**IT IS SO ORDERED.**

<u>s/ Susan G. Braden</u>
**SUSAN G. BRADEN**
**Judge**